# EXHIBIT C

FILED
DALLAS COUNTY
5/15/2015 1:58:34 PM
FELICIA PITRE
DISTRICT CLERK

Crystal McDowell

DC-15-05510

CAUSE NO. _____

| | | |
|---|---|---|
| **SILVERLEAF RESORTS, INC.** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| | § | |
| **Plaintiff,** | § | |
| **v.** | § | **DALLAS COUNTY, TEXAS** |
| | § | |
| **GENPACT INTERNATIONAL,** | § | |
| **INC.** | § | |
| | § | |
| **Defendant.** | § | **____ JUDICIAL DISTRICT** |

---

## SILVERLEAF RESORTS, INC.'S ORIGINAL PETITION

---

Plaintiff Silverleaf Resorts, Inc. ("Silverleaf" or "Plaintiff") files this Original Petition against Defendant Genpact International, Inc. ("Genpact" or "Defendant") and alleges the following:

## I. **INTRODUCTION**

This is an extraordinary case. It is a case in which Genpact's purposeful disregard of its obligations is breathtaking in scope and the cause of massive losses. And what is most striking––even shocking to the conscience—is that Genpact guaranteed that this day would never come.

Silverleaf and Genpact entered into a Master Services Agreement in which Genpact agreed to perform first-party collection services. Genpact, a self-described leader and expert in this field, guaranteed a minimum level of performance and also represented that it would routinely attain even higher targets. It did not. Instead, Genpact's poor execution was well below its promised effort from the get-go and rapidly proceeded to the point of being abysmal. Silverleaf regularly attempted to provide assistance in implementing corrective processes and procedures, and it specifically directed Genpact to, among other things, hire qualified personnel, alter its call times, and modify its collection strategy. Genpact ignored these directives,

obstinately refusing to implement any of them.  Genpact's performance can only be described as a gross deviation from the promises that it made to induce Silverleaf to contract with Genpact, as well as industry standards.

Further, Genpact was well aware of its woeful performance and its devastating impact on Silverleaf. Genpact specifically acknowledged that Silverleaf was "bleeding" due to skyrocketed default rates.  Genpact promised—again and again—that it would "apply vigor" to remedy its wrongs.  Alas, it never did.  Now, Silverleaf has been forced to seek judicial relief to vindicate its rights and recover the substantial damages caused by Genpact's willful and reckless actions.

## II.  DISCOVERY PLAN AND STATEMENT OF RELIEF

1.      Pursuant to Texas Rule of Civil Procedure 190.1, *et seq.*, Plaintiff hereby designates that discovery will be conducted under Level 3 as Plaintiff seeks monetary relief of over $1,000,000.

## III.  PARTIES

1.      Plaintiff Silverleaf is a Texas corporation with its principal place of business in Dallas, Texas.

2.      Defendant Genpact is a Delaware corporation with its principal place of business located in Connecticut.  Defendant engages in business in Texas and this lawsuit arises from Genpact's business in Texas.  Genpact can be served with process through its registered agent, National Corporate Research, Ltd., 800 Brazos, Suite 400, Austin, Texas 78701.

## IV.  JURISDICTION AND VENUE

3.      This Court has jurisdiction over this case as the amount in controversy is within the jurisdictional limits of the Court.

4.      Venue is proper in Dallas County, Texas because a substantial part of the events or omissions giving rise to Plaintiff's claim occurred in Dallas County.  *See* TEX. CIV. PRAC. &

REM. CODE § 15.002(a)(1).

5.     This Court may exercise personal jurisdiction over Genpact pursuant to Texas Civil Practice & Remedies Code § 17.042 by reason of Genpact's business activities in, and its purposeful and meaningful contacts with, the State of Texas as described herein, including: (i) contracting by mail or otherwise with a Texas resident when either party was to perform the contract in whole or in part in Texas, and (ii) committing a tort in whole or in part in Texas. Genpact has purposely availed itself of the privilege of doing business in Texas and has committed torts in Texas. The causes of action asserted herein arise from or are related to the Genpact's specific contacts and activities in this state. The exercise of jurisdiction over Genpact comports with traditional notions of fair play and substantial justice.

6.     Specifically, Genpact has purposefully reached out and sought the protections and benefits of doing business in Texas. The contacts related to this litigation began in May of 2013 when Genpact responded to a request for proposal issued to collection industry leaders by Silverleaf in Texas. Several of Genpact's communications relating to the request for proposal were sent from Genpact's agents that are Texas residents and work at Genpact's office in Dallas, Texas, including Jerry B. Hammon. Subsequently, Genpact traveled multiple times to Texas to meet with various Silverleaf team members about performing Silverleaf's collection. During these trips, Genpact conducted on-site due diligence both at Silverleaf's Dallas and North Richland Hills locations.

7.     Following the due diligence and negotiations conducted in Texas, Genpact and Silverleaf—a Texas corporation headquartered in Dallas—executed a Master Services Agreement on August 27, 2013 ("MSA" or "Agreement"). Under the MSA, Genpact agreed to perform collection services on behalf of a Texas citizen, Silverleaf, in connection with all of

Silverleaf's vacation properties, including six resorts located in the State of Texas.  Genpact agreed to perform the MSA, in whole or in part, in Texas, in that it was to negotiate with Silverleaf timeshare owners, including the 70,809 owners that are residents of Texas, in order to secure payment on past due accounts on Silverleaf's behalf.  Silverleaf's claims against Genpact all stem from Genpact's contact with a Texas company and Genpact's conduct that occurred in Texas.

8.     Since Genpact executed the MSA nearly two years ago, Genpact has also sent representatives to Texas for triage meetings on multiple occasions, as well as sent extensive correspondence and made telephone calls to Texas in furtherance of its relationship with Texas resident Silverleaf.

9.     In addition to these extensive contacts related to Silverleaf and the collection services subject to the MSA, Genpact has other substantial contacts with Texas and its residents. Genpact is a global company with multi-million dollar clients across the United States, including in Texas.  In addition, Genpact owns and operates its own facility in Richardson, Texas, which is located at 3101 E. President George Bush Highway, Suite 200, Richardson, Texas 75082.  *See* http://www.genpact.com/home/regions/regionlanding?RegionName=North%20America.

## V.  <u>FACTS</u>

**A.     *Silverleaf engages Genpact to Perform its Collection Function Based on Genpact's Assurances and Representations***

10.     Silverleaf is an award-winning company founded in 1989 that owns and operates thirteen resorts in six states, has access to an exchange network of over 3,000 resorts worldwide, and employs over 3,000 people.  It is a leader in the development, marketing, and operation of timeshare resorts with a wide array of country club-like amenities.  Its brand was built around and remains committed to four distinguishing factors: value, variety, convenience and flexibility.

11.     With an ownership base of over 100,000 families throughout the United States and North America, Silverleaf is at times confronted with delinquent debt and must take affirmative acts to collect payment. Prior to 2013, Silverleaf had always employed a team of internal collection specialists, who were charged with attempting to bring its customers' accounts current, while at the same time maintain customer satisfaction.  Accordingly, it had developed collection practices and procedures that were aimed not only at maintaining Silverleaf's cash flow but also at providing strong, positive customer service experiences that did not alienate Silverleaf owners.

12.     In early 2013, Silverleaf was faced with the decision of whether to invest heavily in additional technology necessary to improve its in-house collection organization, or potentially outsource its collection function.  While Silverleaf's collection efforts were generally successful, it had not excelled at this function when compared to industry standards.  Third-party analyses revealed that outsourcing Silverleaf's collection function to a professional collection organization would improve operating efficiencies and increase functional effectiveness.

13.     In order to fully evaluate the option of outsourcing, Silverleaf issued an extensive request for proposal to collection industry leaders, including Genpact, in spring of 2013. Genpact designs and runs outsourced business operations that manage cost, risk, and compliance across a range of functions such as finance and procurement, financial services account servicing, claims management, regulatory affairs, and industrial asset optimization.  Among the "solutions" that Genpact markets and sells to an array of industries (including the hospitality industry) is collection services.  Genpact markets itself as a "strategic partner who can deliver improved collections efficiencies," equipped with "***industry-specific*** process management" and "a comprehensive approach to collections which diminishes revenue loss while enhancing the

customer experience." *See* http://www.genpact.com/home/solutions/collections (emphasis added). Genpact represents that companies that engage it to "enhance their collections process realize a two to three-fold reduction in losses." *Id*.

14.     After being short-listed to perform the collection function on behalf of Silverleaf, Genpact—a self-described global leader in such services—conducted due diligence for six to eight weeks, including several days of on-site due diligence during July of 2013, through which it observed and monitored Silverleaf's collection practices and the nature of its timeshare collections. Both prior to and upon completion of its due diligence, Genpact made presentations to Silverleaf on Genpact's capabilities and plans for Silverleaf. During these presentations, Genpact was adamant that it would provide significant improvements in collection rates and customer satisfaction. Genpact's representatives were specifically asked if they felt comfortable regarding their ability to handle timeshare collections due to the unique nature of the industry, in response to which Genpact assured Silverleaf that it understood and felt comfortable with Silverleaf's timeshare-unique collection needs and processes, that it had experience in similar travel and hospitality collection practices, and that it had the expertise, knowledge, and resources to transition **_all_** of Silverleaf's in-house collection work to Genpact. Upon information and belief, Genpact knew these assurances were vastly overstated and therefore false.

15.     Relying on a number of promises made, including promised cost savings, Genpact's purported capabilities, assurances regarding knowledge of the specific collection needs of Silverleaf, and assurances of significantly improved collections with reduced timeshare membership cancellations, Genpact was selected over the other proposals. The representations and claims that Genpact repeatedly made during the bid process regarding its capabilities and personnel were critically important to Silverleaf's decision to select Genpact over other qualified

service providers.  But for such promises, which Silverleaf relied upon heavily, Silverleaf would not have contracted with Genpact.

**B.**    ***Genpact's Obligations Under the Master Services Agreement and Statements of Work***

16.    Silverleaf and Genpact entered into the MSA and two Statements of Work ("SOW") dated as of August 27, 2013, by which Genpact agreed to provide collection services for Silverleaf in accordance with the terms and conditions set forth therein.  Specifically, SOW No. 1 (Collections) required Genpact to provide the collection services previously performed by Silverleaf (including all collections activities related to obligor accounts, such as unpaid principal and interest on obligor accounts, club dues, and other fees, charges, expenses and amounts owed by the obligors to Silverleaf) in accordance with agreed upon Standard Operating Procedure ("SOP") documents and Silverleaf's Collection Procedures, both of which are attached to SOW No. 1.  SOW No. 1 specified, among other things, that Genpact was to be a "sub-servicer" of Silverleaf, with Silverleaf remaining the "primary servicer" with respect to debt collection services.  As such, while Genpact was to be ultimately responsible for providing all collection services, Genpact promised to follow detailed Collection Procedures established by Silverleaf, which provided, *inter alia*, that account representatives be "thoroughly knowledgeable of the timeshare industry" in order to help Silverleaf's customers keep the promise of payment made at the initial time of sale.  The SOP Genpact agreed to follow was the same SOP Silverleaf had followed for several years prior to the Agreement.

17.    Furthermore, SOW No. 1 and the Agreement contemplated that Silverleaf would direct Genpact on the requirements of applicable law, including the application of the Fair Debt Collection Practices Act ("FDCPA"), with SOW No. 1 stating as follows:

> **11.1 Definition**.  "Applicable Laws" under this Statement of Work shall expressly include, in the case of Genapct under subpart (a) of the definition, (x) any and all Laws that relate to or govern the specific collection Services undertaken by Genpact hereunder

(including, for this purpose, the Fair Debt Collection Practices Act) and (y) any and all Laws that relate to or govern the industry in which Customer operates if, but only if, relevant to the provision, delivery or receipt of collection Services hereunder; provided, in each case of (x) and (y) above, the specific requirements of such Laws are given to Genpact in writing by the Customer.

18.     In accordance with this and other provisions, Genpact was directed to perform its services as a first-party collector or creditor (i.e., in Silverleaf's name), as opposed to a third-party collector or debt collector, and the parties specifically agreed to this arrangement. *See also* SOW No. 1, Ex. 10 "Collection Procedures," at 3 ("We are first party collections, and as such [the FDCPA] does not technically apply to our efforts to service the loan."). The first-party versus third-party distinction is crucial as different laws and regulations are implicated depending on the capacity of the collector. Indeed, in early August negotiations, Genpact provided an entire presentation to Silverleaf on the importance of being able to function as a first-party as opposed to third-party collector. Genpact represented that collection rates increase when efforts are performed by a first-party collector, *i.e.*, the entity to which the debt is owed. Conversely, due to legally-mandated disclosures and restrictions, third-party collections rates are historically markedly lower.

19.     Genpact insisted that it should perform as a first-party collector, but wanted assurance that this was permissible. In response, the parties agreed that Silverleaf would dictate what was permitted under the "Applicable Laws" and indemnify Genpact in the event its interpretation was found to be incorrect, with any risk in this regard assumed by Silverleaf. The parties discussed this issue for weeks, as they both wanted to ensure compliance with first-party collector regulations. These were also the same practices that Genpact had routinely employed in performing operations for other companies. Both parties knew Genpact must operate as a first-party collector and Genpact knew that it was to operate as a first-party collector, and employ

the first-party collection requirements *as articulated by Silverleaf*.  In fact, Genpact agreed to indemnify Silverleaf from and against certain losses arising out of, or relating to Genpact's failure to comply with the Applicable Laws requirements as dictated by Silverleaf, whether intentional or unintentional.  MSA 19.1(e).

20.     SOW Number 2 (Surge Resources) required Genpact to assign an initial surge resource team of five members, who would undergo training on Silverleaf's current collections operations, and to provide specific deliverables relating to the smooth transitioning of Silverleaf's current collection activities to Genpact.  With the collections function being outsourced, Silverleaf was dramatically downsizing its internal Financial Services Department and would no longer have the resources required to provide all collections services internally as that is what Genpact was being hired to do.  Therefore, it was crucial that the transition went smoothly.

21.     In executing the MSA and the SOWs, Genpact expressly acknowledged the differences between collections in the timeshare industry context and traditional context. Genpact was required to meet certain Expected Service Levels of collection set forth in the MSA, with Minimum Service Levels also defined (together, the "Service Levels").  The Service Levels were determined based on Silverleaf's historical performance and Genpact's representations that it would do better.  Genpact assisted in determining the appropriate Service Levels.  In fact, prior to the engagement, Genpact *lowered* its cost estimates and indicated that its fee should be less as it believed it would be more efficient than originally anticipated in meeting the Service Levels.  Genpact agreed that it would dedicate whatever resources proved necessary to achieving the Service Levels, including hiring additional staff, purchasing necessary support

tools, and providing adequate facilities.  Genpact was compensated a predetermined amount no matter how much it spent doing so or how it performed.

## C.      Genpact's Performance Failures

22.      The transition of collection services to Genpact began in September 2013, with the go-live date for Genpact taking over *all* collections scheduled for January 2014.  However, Genpact almost immediately began falling far short of what was promised and was required of it under the MSA and SOWs, in terms of operations, personnel, results, and corrective action. Default rates on Silverleaf's outstanding debts not only failed to improve, but they actually got worse.   Meanwhile, Silverleaf incurred major expense and budget overruns caused by simultaneously paying Genpact substantial sums under the MSA and SOWs while expending significant funds troubleshooting and attempting to effect the smooth transition that Genpact had promised.

23.      Due to atrocious default rates, early stage collections, meaning accounts that were 1 to 30 days delinquent ("Key Measurement 1" or "KM1 Collections"), were not fully transitioned until December 1, 2013, with later stage collections—those that were (i) 31 to 60 days delinquent ("CSL1"), (ii) 61 to 90 days ("CSL2") and (iii) 91 or more days ("CSL3")— being transitioned even later or not at all.  As a result, Silverleaf was forced to spend unbudgeted funds in order to maintain a staff of more than 25 collection specialists to assist Genpact with collections that Genpact had failed to timely transition.   As Genpact is well aware, saving accounts earlier in the delinquency stage is crucial to future default potential.  For example, when Genpact missed the target for CSL1 collections (30-60 day) by $5.7 million in June of 2014, then that overflow fell to the CSL2 (61-90 day) the next month, resulting in a higher number of accounts passing to the CSL2 phase and collection ultimately missing the target for

the CSL2 phase by $2.9 million for July 2014.[1]  Again, due to the higher number that entered the CSL2 phase more accounts passed to the CSL3 phase (91 days plus) the following month, resulting in collections ultimately missing the target by $2.1 million for August 2014, and ultimately resulting in about $24.55 million more than targeted in additional defaults over a fourteen-month span.[2]

24.     Beginning in January of 2014, the problems were so apparent that Silverleaf initiated dashboard review calls three times per week, during which Genpact and Silverleaf would review specific issues and discuss how to remedy them.  Genpact also submitted daily performance reports, which reflected that the performance rates were not improving.  Genpact acknowledged the performance deficiencies and the need to revise its procedures.  It repeatedly told Silverleaf that it was "applying rigor" and was going to remedy the problems, including monthly presentations that outlined specific action items Genpact was to take.

25.     Based on Genpact's continued assurances, Silverleaf began transitioning at least a portion of other collection stages to Genpact in 2014 in accordance with the MSA. Unfortunately, Genpact's assurances proved to be hollow.  As Genpact's performance continued to decline, the decision was made for Silverleaf to retain all late-stage collections in April 2014 so that Genpact could focus on saving the KM1 and CSL1 accounts.[3]  Starting May 2014, all CSL2 collections and CSL3 collections were transferred back to Silverleaf.[4]  Forcing Silverleaf to re-assume responsibility for these portions of the collections also forced Silverleaf to engage additional staff and spend un-budgeted expenses of approximately $2.5 million in 2014 alone.

---

[1] Jan. 2015 Silverleaf Collections/Defaults Update, at 3.
[2] *Id.*
[3] *See, e.g.,* April 30, 2014 E-mail from Pankaj Chadha to Joe Conner and Phil Davis entitled "RE: SRI Collections Update April 30th 2014.pptx."
[4] *Id.*; *see also* May 2, 2014 E-mail from Barbara Lewis to Pankaj Chadha entitled "RE: May Account Alignments - Quantity and Volumes."

**D.      *Genpact's Acts and Omissions Demonstrate the Falsity of Its Prior Representations and Complete Disregard for Its Obligations Under the MSA***

26.      Far from being "thoroughly knowledgeable" of the industry as represented, Genpact proved to have virtually no understanding or familiarity with collecting debt from timeshare obligors, as opposed to, for example, credit card debt or other sorts of standard, unsecured debt.  Among other things, Genpact failed to properly manage or train the employees who were tasked with Silverleaf's collections, and its reporting system proved unworkable for the real-time reporting and metrics that the MSA required.  Genpact failed not only to meet the Service Level milestones of the project month after month, but when Silverleaf attempted to address and correct operational deficiencies and problems with Genpact, Genpact consistently failed to implement any plan for resolution, despite further assurances that it would.

27.      There are endless illustrations of Genpact's falsehoods and reckless disregard.  To begin with, instead of approaching its collection efforts as a sub-servicer to Silverleaf, it shunned the collection procedures developed by Silverleaf and instead stubbornly approached its collections as though it were a third-party collection agency.  For example, based on Silverleaf's interpretation of the "applicable laws," Silverleaf would leave single messages on different phone numbers for the same account during the same day and would call each number multiple times as long as it only left one message on that number.  This is expressly set forth and agreed to as the appropriate practice within SOW No. 1.[5]  Genpact, on the other hand, refused to leave a message on a second phone number for the same account or to even call the same account after it left a message on any of the account's numbers, and often times did not even leave a message on one number for the account.  Exacerbating the problem, Genpact would leave a message the first

---

[5] SOW No. 1, Schedule 10 "Collection Procedures," at 3 ("For example, we can call Mr. Smith at home, leave a message, call him at work, leave a message, and call his Next of Kin and leave a message, but we may not leave 2 messages at the same number in the same day.").

time it called a number, then, due to its usage of a scheduler dialer, would not pull the delinquent account again after a message had been left—meaning only one collection attempt was made. This improper and inadequate practice was brought to Genpact's attention as early as October 2013, when Silverleaf instructed Genpact to fix the issue.   While Genpact acknowledged on numerous occasions that it was not employing the first-party collection practices as it agreed to, it continued to assure Silverleaf that it was improving its practices, and would improve its performance.   Genpact did temporarily implement some of the correct procedures in May and June of 2014, but quickly reverted to its improper practices.

28.   Similarly, Genpact failed to employ the account ownership model as required under SOW No. 1.   *See* SOW No. 1 ¶ 2.17 (Genpact shall "separate calling campaigns by portfolio").   Genpact was to employ an account ownership model, in which each account was assigned to an agent who would handle all collection attempts for that account.   As Genpact itself acknowledged, this gives an opportunity for the agents to develop rapport and capture key account specific details for better performance, creating "high ownership and personalized resolution,"[6] which is critical in timeshare collections.   Instead, Genpact used a limited ownership model based on account segmentation, through which accounts were randomly assigned each shift, regardless of which representative had previously dealt with the account. Genpact understood the tremendous impact this model had on save rates and assured that it was going to implement Silverleaf's model on several occasions, but it was never fully implemented. Instead, only about 30 percent of the group was moved to queue based account ownership system as part of a limited pilot program.

---

[6] SRI Action Plan Oct. 7, 2014 pp. 4 and 12.

29.     In addition, the SOP specifically provides that calls should be placed during the day, during the evenings, and on Saturdays to ensure that an account is contacted.[7]   This is crucial to the collections process, yet Genpact ignored this agreed to requirement.   When Silverleaf was handling its own collections, approximately ninety agents were staffed to attempt collections during nights and Saturdays—"prime" collection hours when collection success rates are higher.   In contrast, at the outset Genpact was scheduling under twenty agents to work on Saturdays and there was not even workspace for agents to assist with collections in the evenings. The space Genpact used during the day was leased out to a different company in the evenings, preventing Genpact from scheduling a sufficient number of agents during that time. Additionally, agent schedules did not focus on prime Saturday collections because Genpact could not have staff work more than five days per week and refused to hire additional team members to make up for the prohibition to provide Saturday coverage.   For months, Genpact assured Silverleaf that it was working on a solution to allow more staff to work in the evenings[8] and "realigning current scheduling & staffing based on optimal contact windows to ensure right people at right place at right time."[9]   While some improvements were made, the scheduling requirements were never fully satisfied as Genpact promised they would be.   Genpact even reverted back to using its old space, where agents were unable to fill evening shifts.

30.     In sum, Genpact disregarded its obligation to take all steps necessary to ensure compliance with the promised Service Levels, whether that be hiring more people or adding more work stations to ensure weekend and evening calls were made.

---

[7] SOW Number 1, Schedule 10 "Collection Procedures," at 3 ("An equal number of day time calls and evening calls should be placed on the account, as well as Saturday attempts to ensure that we contact the member.").
[8] Lewis, Barb, "Genpact - Agent Related Practices," June 9, 2014, p. 10.
[9] SRI Action Plan Oct. 7, 2014, p. 8.

31.    Furthermore, Genpact failed to properly staff its operations.  Genpact did not hire qualified account representatives that were "thoroughly knowledgeable of the timeshare industry" as agreed to under SOW No. 1.  While running its own collections, Silverleaf would generally only hire account representatives with at least three years of collections experience and would impose a ninety-day review period in order to verify the agent was competent.  Genpact, on the other hand, did not impose any experience requirements and failed to exhibit any concern for the qualifications and capabilities of the agents it hired to staff Silverleaf's collections. Compounding the problem, Genpact lacked the sheer number of agents required to meet the Service Levels and to take over all collection as it represented that it would.  Genpact likewise failed to have sufficient management monitoring its agents' performance, utilizing a 1 manager to 12-15 employee ratio as opposed to Silverleaf's more successful 1 manager to 10 employee ratio.  As early as January 2014, Silverleaf told Genpact that it needed to hire more agents and more capable agents.  Genpact did attempt to hire a few more agents, but did not improve the quality of its agents or replace those that proved unqualified.  In fact, Genpact's internal policies discouraged replacing agents that proved to be incapable, as managers' compensation was negatively impacted if they had a high turnover rate.

32.    Genpact also failed to provide required reports in order to downplay the full extent of its performance failures.  For instance, for every "Service Level Default" that occurred, Genpact should have performed, at its own expense, a reasonably detailed root cause analysis of such default, and should have reported it to Silverleaf with a remediation plan.  Despite systematic Service Level Defaults, Genpact failed to perform any root cause analyses, report them to Silverleaf, or propose any remediation plans.

33.     Genpact's performance failures were not the result of occasional negligence or oversight; rather Genpact systematically declined to implement the procedures or provide the additional resources it promised to provide in order to achieve the Service Levels.

34.     Silverleaf provided Genpact with ample training opportunities and instruction on what procedures needed to be employed, but to no avail.  At the outset, Silverleaf conducted two rounds of training in Texas with approximately eight individuals included in Genpact's lead group.  Silverleaf reviewed the SOP, training manuals, product training, and call scripts, and spent approximately two weeks allowing Genpact to monitor calls and participate in tandem with Silverleaf's financial services group conducting the collections.  Thereafter, the Director of Silverleaf's Financial Services travelled to Manila to provide training and instruction to Genpact on collection procedures on six separate occasions between October of 2013 and July of 2014, devoting 108 days.  Various Division Managers, Account Managers, and Agents also devoted an additional 283 days collectively to providing hands-on training at Genpact's facilities, resulting in considerable costs—the majority of which would not have been incurred had Genpact followed through with its promised commitments.  Genpact was also provided with extensive training and reference materials, which directed Genpact on how to handle specific situations with customers in the manner that Silverleaf had previously successfully handled them. These reference materials and scripts were ignored.

35.     Genpact's continuous misrepresentations and false affirmations that it was curing the issues and was going to comply with the SOP further evidence Genpact's intentional wrongdoing.  Upon information and belief, Genpact made these representations either knowing that it was not going to attempt to change its practices or knowing that it was not capable of

doing so, so that it could string Silverleaf along and continue receiving payments under the MSA while Silverleaf continued to suffer further damages.

**E.      *Silverleaf Engages a Third-Party to Assess Genpact's Performance***

36.      By the summer of 2014, Genpact had still not completed the transition of the debt collection function from Silverleaf, and its collections operations had failed to stabilize. Consequently, Silverleaf hired a consulting firm to assess and suggest solutions for Genpact's systematic failures.   The consulting firm's report setting forth its observations and recommendations (the "Third-Party Report") was comprehensive.   Among other problems, the firm found that Genpact's initial and projected staffing levels were woefully inadequate, that Genpact's agent-level technical competence and soft skills were lacking, that Genpact's knowledge of the timeshare industry was insufficient, and that Genpact's environment set up for its overseas collections agent was not conducive to satisfactory performance, including the ability to adequately staff for prime time evening collection hours.   The consultant concluded also found:

- "Efforts to improve performance and move to a proactive posture have been insufficient to resolve issues…A dedicated Account Manager is lacking…Formalized governance has not been adopted"

- "Clear understanding of nuances and complexities associated with timeshare collections underestimated" and

- Numerous deficiencies with tools, transition, skillset, scheduling, environment, collection aids, processing and analytics were prevalent.

Indeed, the consulting firm stated that it has never seen Genpact so poorly perform and that Genpact appears not to have used its "B- Team," but rather its "D- Team."   Genpact was provided with a copy of the Third-Party Report detailing the problems identified and solutions to be implemented.

**F.      Genpact's   Reckless   Indifference   Continues   Despite   the   Third-Party's Recommendations and Genpact's Further Assurances**

37.      In September 2014, Silverleaf served Genpact with its first notice of default.  In response to the default notice and presumably the Third-Party Report, Genpact indicated that it was going to implement several "recommitment" measures.  These were formally discussed at a September 25, 2014 Executive Session, in which Genpact apologized for its past performance and assured Silverleaf that it was "aligned to [the Third-Party] study conclusion."  Genpact outlined numerous initiatives that it assured Silverleaf it would implement with deadlines for each.  Genpact indicated it would "take a fresh look at current process and operations vs collections best practices."[10]  Genpact also represented that it was "adapting to [Silverleaf's] Calling Strategy" including "scheduling changes to minimize inbound abandon calls/improve Prime Time."[11]

38.      At the Executive Session, Genpact fully acknowledged its failure to meet the required Service Levels, with one of the slides in its presentations entitled "Intense focus on stopping the *bleeding* immediately, reaching KM1 *minimum* target."[12]  A new action item identified was to "synchronize auto-dialer schedule and agent population to match *required* contact intensity and frequency," meaning Genpact acknowledged it was not previously contacting accounts as it promised under the MSA.[13]  Genpact also began preparing and presenting weekly Action Plans and Action Item Status reports, which included progress on implementing plans, practice insights and new initiatives, and updates on metrics and forecasts.[14]

---

[10] Sept. 25, 2014 Silverleaf Executive Session, at 2.
[11] *Id*. at 4.
[12] *Id*. at 5 (emphasis added).
[13] *Id*. at 5 (emphasis added).
[14] *Id*.

These were discussed during calls with Silverleaf, but the plans and initiatives were never implemented.

### G.     *Genpact Confirms it Has No Intention to Remedy its Reckless Behavior*

39.     When Genpact's performance continued to decline, Silverleaf determined it would also need to take over some of the CSL1 (31 to 60 day delinquent) collections.  Silverleaf was forced to hire new staff to assist in transferring the early stage collections back to Silverleaf. In December 2014, there were four times as many Genpact agents as there were Silverleaf agents working accounts with the CSL1 accounts.  Nevertheless, Silverleaf agents collected almost half of the past-due amounts saved in that category during that month, or $6MM of the $14MM saved.[15]   In fact, the newly-trained Silverleaf agents averaged 2.3 saves per agent per day, whereas Genpact's "trained" agents only averaged one save per agent per day.[16]   In sum, due to Genpact's failure to implement the proper procedures and failure to hire qualified agents, Genpact required twice as many people to get even close to the same results as Silverleaf's newly hired staff.

40.     In a December 2014 meeting, Genpact conceded the issues identified in the Third-Party Report had not been resolved and that the "recommitment measures" were not working. For the first time, Genpact did not respond with its "we're working to change and fix this" mantra it had urged for the previous year plus.  Instead, Genpact admitted that it was going to continue to follow its own procedures in line with its own interpretation of the "applicable laws"—meaning it would not implement, amongst other things, the messaging procedures that it had agreed to use under the MSA.

---

[15] Jan. 2015 Silverleaf Collections/Defaults Update at 4.
[16] Jan. 2015 Silverleaf Collections/Defaults Update, at 4.

41. Analyses compiled in connection with Silverleaf's January 2015 Board of Directors meeting revealed Genpact had ***never*** met the Expected Service Level Default Ratio, and only met the Minimum Service Level three months in over a year and half span.[17] Genpact's failure to collect during the early stages had resulted in more accounts progressing to later stages and ultimately defaulting, with the total yearly default percentage over book size increasing markedly from Silverleaf's historical performance, which equated to substantial additional losses.

42. On January 12, 2015, an executive meeting was held, during which Silverleaf advised Genpact that it would be pulling back all accounts within the CSL1 category by month-end. This "insourcing transition" has and will continue to result in extra expenditures for Silverleaf, including costs to rent extra space to house the required staff and payments for recruiting, training, updated software and dialer systems, new staff equipment, and staff salaries.

43. Genpact provided a report for the meeting, which specifically highlighted "operational variations" and noted that "stark variations" existing between Genpact's and Silverleaf's calling approaches.[18] Genpact was still failing to observe the promised procedures by using a limited ownership model based on account segmentation as opposed to the individual customer connect Silverleaf employs and Genpact said it would follow.[19]

## H. *Genpact Reckless Disregard has Caused and Continues to Cause Silverleaf Substantial Harm*

44. On information and belief, despite its proposals, presentations, representations, and assurances to the contrary, Genpact lacks the expertise, knowledge, personnel, resources, and—most importantly—willingness to perform its obligations under the MSA and SOWs.

---

[17] *Id*. at 3.
[18] Jan. 12, 2015 Silverleaf/Genpact Executive Meeting, at 8.
[19] *Id*.

Genpact knew that it lacked these attributes when it entered into the MSA and SOWs.  In other words, Genpact entered into the MSA with Silverleaf knowing that Genpact would be unable and unwilling to perform its promises under the MSA and with reckless indifference to the impact on Silverleaf.  The Third-Party assessor stated that, in seventeen years, it had never seen anything like this before.

45.     While Silverleaf is not only paying Genpact substantial sums under the Agreement for services that Genpact has failed to provide, it is losing considerable monies due to Genpact's incompetency and failure to deliver.  Genpact currently maintains responsibility for about 90% of the KM1 collections, with no responsibility for the CSL1, CSL2 or CSL3 collections—meaning Silverleaf was forced to spend considerable time and resources in order to hire, train, and house its own staff to do Genpact's work for them.  Even handling a substantially reduced number of collections, Genpact has failed to consistently meet the required Service Levels.  Indeed, Genpact—which holds itself out as a collections "expert"—was unable to maintain Silverleaf's historical delinquency averages.  Achieving the Expected Level of Defaults would have resulted in approximately $25 million less write-offs against Silverleaf's Bad Debt Allowance for 2014 and 2015.

46.     Genpact's *misrepresentations*, *willful failures*, and *apparent indifference* with respect to its relationship with Silverleaf constitute breaches of its contractual and its common law obligations, and have caused Silverleaf to incur substantial monetary damages in an amount not less than $28 million to date, which continue to accrue.

## VI.  CAUSES OF ACTION

### COUNT I:
### Fraud / Fraud in the Inducement

47.     Silverleaf incorporates by reference each of the allegations above as though said allegations were set forth fully herein.

48.     As shown above, Genpact: (i) knowingly made false representations to Silverleaf regarding its knowledge, expertise, experience, and resources, and/or (ii) entered into the MSA and SOWs with no intention of satisfactorily performing under them and/or in accordance with Silverleaf's expectations, as set by Genpact.

49.     Genpact willfully made these false representations with the intent to deceive Silverleaf and to induce Silverleaf to select Genpact over its competitors, to bind Silverleaf to the MSA, to cause Silverleaf to discard its internal collections business so that it had no choice but to rely on Genpact, and to pay large monetary sums to Genpact.  Silverleaf reasonably and justifiably relied on Genpact's promises and representations to its detriment, entered into the MSA and SOWs due to such reliance, and has incurred significant economic injury as a result.

## COUNT II:
### Fraud By Non-Disclosure or Omission

50.     Silverleaf incorporates by reference each of the allegations above as though said allegations were set forth fully herein.

51.     Genpact had obligations to disclose certain information to Silverleaf, including: (i) to disclose the whole truth when it disclosed information to Silverleaf, (ii) to disclose new information when it knew the new information made a prior representation false or misleading, and (iii) to speak up when it made a partial representation that conveyed a false impression.

52.     Genpact failed to comply with these obligations by intentionally concealing or otherwise failing to disclose material facts that Genpact was initially or subsequently became aware of, including information that Genpact: (i) was unable to perform to the service levels under the MSA and SOWs, (ii) lacked sufficient capacity and manpower to provide for

appropriate staffing during nights and weekends as it represented it would do; (iii) was unable and/or unwilling to follow the MSA or SOWs in performing the collection function; (iv) was unwilling to follow Silverleaf's directives regarding the "Applicable Laws;" (v) lacked understanding of the affirmative collection process; (vi) was unwilling to devote the resources required to meet the Service Levels; and (vii) was incapable of achieving the Service Levels.

53.    Genpact knew that Silverleaf was ignorant of these material facts and did not have an equal opportunity to discover such information.  Genpact deliberately failed to disclose the information in order to induce Silverleaf into executing and continuing to tender payment under the MSA.

54.    Silverleaf relied on Genpact's non-disclosures to its detriment, meaning that Silverleaf would have acted materially different than it did had such disclosures been made by Genpact.  Silverleaf suffered injury as a result of acting without the knowledge of the undisclosed facts.

## COUNT III:
## Gross Negligence / Negligent Misrepresentation

55.    Silverleaf incorporates by reference each of the allegations above as though said allegations were set forth fully herein.

56.    Alternatively, Genpact had a duty to provide correct information to Silverleaf in conjunction with Silverleaf's bid process and in the course of negotiation and performance of the MSA and SOWs (collectively, "Transaction") regarding Genpact's knowledge, expertise, experience, capacity, resources, intentions, and initiatives.  Genpact, in the course of its business, supplied false information for the guidance of Silverleaf in the Transaction, which Silverleaf justifiably relied upon in selecting Genpact as its collections vendor, entering into the MSA and SOWs, and in continuing to perform under the MSA and SOWs.  And, Genpact failed to exercise

reasonable care or competence in obtaining or communicating this information to Silverleaf. Genpact intended the false information to influence Silverleaf in its decision to execute and continue performing under the MSA and SOWs, and Silverleaf did in fact rely on such information in the Transaction, resulting in damages.

57.     In addition, Genpact had a duty to perform the services described in the MSA and SOWs in the manner and up to the standards of care of a professional, diligent provider of similar services.  Genpact failed to perform such duties with intentional, willful and/or reckless disregard to the rights of Silverleaf.

58.     As a result of the gross negligence and grossly negligent misrepresentations made by Genpact, Silverleaf has suffered economic injury.

## COUNT IV:
## Willful Misconduct

59.     Silverleaf incorporates by reference each of the allegations above as though said allegations were set forth fully herein.

60.     Alternatively, despite knowing that there was no chance that it could ever perform as promised under the MSA and that the MSA was doomed from the outset, Genpact intentionally pursued certain actions to ensure the MSA was executed.  Thereafter, Genpact took affirmative actions and made intentional representations in order to continue leading Silverleaf down the primrose path and ensure that it continued to receive payments under the MSA, all the while knowing it lacked the capacity and willingness to perform as promised.

61.     In addition, Genpact intentionally disregarded Silverleaf's "Applicable Laws" requirements, following its own operating procedures as opposed to those mandated by the MSA and SOWs, refused to hire more qualified staff, and chose not to employ sufficient "prime time" staff on nights and weekends.  Genpact not only knew that there was a risk that taking these

actions would result in harm to Silverleaf, it fully acknowledged these actions were in fact causing harm to Silverleaf on various occasions.  Nevertheless, Genpact disregarded the risks and stayed its course.

62.     As a result of the Genpact's willful misconduct, Silverleaf has suffered economic injury.

## COUNT V:
## Breach of Contract

63.     Silverleaf incorporates by reference each of the allegations above as though said allegations were set forth fully herein.

64.     Silverleaf has performed all of its obligations under the MSA and SOWs.

65.     Genpact, however, has failed to perform its obligations under the MSA and SOWs, which constitutes a number breaches thereof.  Specifically, Genpact has breached the contractual obligations it owes to Silverleaf in at least the following ways:

a) failing to perform its obligations pursuant to the fundamental principal of good faith and fair dealing (MSA 21.10);

b) failing to use commercially reasonable efforts in performing its contractual obligations (MSA 21.10);

c) failing to perform all acts necessary and required to carry out the intent of the MSA (MSA 21.18);

d) failing to provide all of the Services described in the SOWs (MSA 4.1(a));

e) failing to provide services necessary and appropriate to carry out the services promised under the MSA (MSA 4.1(b));

f) failing to comply with the Standard Operating Procedures for each applicable SOW (MSA 4.2(c));

g) failing to provide the reports set forth in Exhibit 10 of the MSA for any and all Services to be performed by Genpact (MSA 4.4);

h) failing to provide the individual reports set forth in Schedule 7 to the applicable Statements of Work in accordance with the frequencies set forth therein (MSA 4.4);

i) failing to provide, at its sole cost and expense, all facilities, personnel, Software Equipment and other resources necessary or reasonably appropriate to provide the services required to be performed under the MSA (MSA 4.7);

j) chronically failing to meet minimum service levels (MSA 7.1. and Exhibit 6 thereto, SOW Number 1 and Exhibit 6 thereto);

k) failing to perform Root Cause Analyses and present remediation plans for Service Level Defaults (MSA Exhibit 6);

l) failing to provide adequate personnel and resources to ensure its services are provided in the manner contemplated by the MSA, including failing to staff the Silverleaf account with high-quality, experienced personnel (MSA 14.1(b), (c));

m) lacking the capacity to perform its obligations under the MSA (MSA 17.1(c));

n) failing to perform the services contemplated under the MSA to the standard of skill and care of a professional, diligent provider of similar services (MSA 17.1(g));

o) failing to adequately remediate performance lapses and improve services (SOW Number 1 and Exhibit 1 thereto);

p) failing to follow the agreed to Collection Procedures (SOW No. 1 and Exhibit 10 thereto);

q) failing to comply with the Applicable Laws requirements as directed by Silverleaf (SOW No. 1 ¶ 11.1 and MSA 17.1(f));

r) failing to use reasonable efforts to mitigate Silverleaf's losses suffered in connection with the MSA (MSA 19.6);

s) failing to ensure that all applicable Silverleaf established policy guidelines were followed and failing to report policy exceptions promptly to Silverleaf (SOW No. 1 2.6);

t) failing to comply with Silverleaf's processes and systems security and access policies (SOW No. 2.9);

u) failing to drive continuous improvement of the work processes, documentation, and Services (SOW 2.10).

66.     As a direct result of Genpact's breaches of contract, Silverleaf has suffered economic injury.

67.     All conditions precedent have been satisfied or waived.

## VII.  <u>RELIEF REQUESTED</u>

WHEREFORE, Plaintiffs respectfully request the following relief:

a)   Direct, consequential, damages in an amount to be proven at trial, but in an amount not less than $28,000,000;

b)   Punitive damages in an amount to be determined by the jury;

c)   Costs of suit incurred herein;

d)   Pre- and post-judgment interest through at the highest rate allowable;

e)   Reasonable and necessary attorney's fees through trial, appeal, and Supreme Court review; and

f)   Such other and further relief as the Court may deem just and proper.

Respectfully submitted,

 /s/ Robert M. Hoffman
Robert M. Hoffman
State Bar No. 09788200
roberthoffman@andrewskurth.com
Mark A. Shoffner
State Bar No. 24037490
markshoffner@andrewskurth.com
Crystal L. Jamison
State Bar No. 24073261
crystaljamison@andrewskurth.com

ANDREWS KURTH LLP
1717 Main Street, Suite 3700
Dallas, Texas 75201
(214) 659-4653 Telephone
(214) 915-1483 Facsimile

*Attorneys for Plaintiff Silverleaf Resorts, Inc.*